In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3652

KIERSTEN M. TAYLOR-NOVOTNY,

*Plaintiff-Appellant,*

*v.*

HEALTH ALLIANCE MEDICAL PLANS,
INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:12-cv-02132-jes-jag — **James E. Shadid**, *Chief Judge.*

ARGUED MAY 28, 2014 — DECIDED NOVEMBER 26, 2014

Before RIPPLE, WILLIAMS, and HAMILTON, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Kiersten M. Taylor-Novotny brought this action against her former employer, Health Alliance Medical Plans, Inc. ("Health Alliance"), under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Specifically, she contended that Health

Alliance had failed to accommodate her multiple sclerosis as the ADA required, had discriminated and retaliated against her based on her disability, had interfered with her FMLA rights, and had discriminated against her based on her race. She also asserted a state law claim of intentional infliction of emotional distress. The district court granted summary judgment for Health Alliance on each of her claims.[1]

We now affirm the district court's judgment. Ms. Taylor-Novotny cannot succeed on her ADA discrimination claim because she did not establish that she was disabled within the meaning of the ADA and because she was not meeting Health Alliance's legitimate expectations for punctuality and accountability. Her failure to meet Health Alliance's legitimate expectations also forecloses her race discrimination claim. She cannot succeed on her ADA failure-to-accommodate claim because she did not establish that the additional accommodation that she sought from Health Alliance was reasonable. Further, the evidence that she offers for her ADA retaliation claim is insufficient to form a convincing mosaic suggesting that Health Alliance retaliated against her because she sought accommodations for her multiple sclerosis. Finally, her FMLA interference claim must fail because Health Alliance never denied Ms. Taylor-Novotny FMLA leave.

---

[1] On appeal, Ms. Taylor-Novotny does not challenge the district court's ruling on her intentional infliction of emotional distress claim. We therefore do not address it.

# I

# BACKGROUND

## A. Facts

Ms. Taylor-Novotny, an African-American woman, began her employment with Health Alliance in November 2005. She was hired by Jeff Polk, who also is African-American, for the position of Contract Specialist I. As a Contract Specialist I, Ms. Taylor-Novotny was a salaried, rather than hourly, employee. Her job responsibilities included document preparation, negotiating and reviewing contract terms with medical providers, planning proactively for contract renewals, and documenting activities related to medical provider contracts in a contracting management system. At the time Ms. Taylor-Novotny was hired, she had not been diagnosed with multiple sclerosis.

Almost immediately, Ms. Taylor-Novotny encountered difficulties with punctuality and attendance. Cherie Fletcher, Ms. Taylor-Novotny's immediate supervisor, discussed the issue of tardiness with her in May 2006, and again in December 2006. When Ms. Taylor-Novotny received her first annual performance review in January 2007, Fletcher rated her overall performance as average, but rated her attendance and punctuality as marginal. Fletcher noted that Ms. Taylor-Novotny "routinely" arrived late and that she had an "unusual" number of appointments during the work day, including at least thirty appointments noted by Fletcher.[2]

---

[2] R.31-2 at 30–31.

In March 2007, Health Alliance adjusted Ms. Taylor-Novotny's work schedule to make it easier for her to arrive on time. Specifically, the company pushed back her start time from 8:00 to 8:30 a.m. Shortly after this adjustment, in April 2007, Ms. Taylor-Novotny was diagnosed with multiple sclerosis.

The adjustments to Ms. Taylor-Novotny's schedule did not have the desired result. Ms. Taylor-Novotny was tardy twenty-nine times between March 28, 2007, when her start time was changed, and September 10, 2007. In October 2007, Fletcher met with Ms. Taylor-Novotny to discuss her "[c]ontinued [t]ardiness" and to implement a "Corrective Action Plan."[3] The plan required Ms. Taylor-Novotny to check in with Fletcher upon arrival each day. To assist Ms. Taylor-Novotny in her efforts to arrive in a timely fashion, Health Alliance again adjusted her start time to 8:45 a.m. The plan warned Ms. Taylor-Novotny that continued tardiness would result in progressively more serious discipline, beginning with warn-ings and ending with termination. Ms. Taylor-Novotny signed the plan.

Ms. Taylor-Novotny's December 2007 performance evaluation recorded ongoing problems with tardiness. She was rated "Average" in most categories, but "Marginal" in the categories of "Initiative" and "Attendance and Punctuality."[4] The review indicated that Ms. Taylor-Novotny had an "ongoing problem with tardiness despite the adjustment of her

---

[3] *Id.* at 33.

[4] *Id.* at 35–36.

work hours on two different occasions."[5] She was reminded that a "corrective action plan [had been] implemented" in October 2007 and that, despite Ms. Taylor-Novotny's status as a salaried employee, "there [wa]s still an[] expectation that she ha[ve] predictable attendance and office hours."[6]

On May 25, 2008, Ms. Taylor-Novotny submitted an FMLA Certification to Health Alliance for her multiple sclerosis. Her physician recommended that she work two days a week from home and noted that she "may miss work for appts/testing/or due to [her multiple sclerosis] diagnosis."[7] Health Alliance approved "intermittent time off as needed to manage [her] condition as specified by [her] physician."[8] Health Alliance noted, however, that it was Ms. Taylor-Novotny's "*responsibility to let [her] manager know each time an absence from work will be necessary, as well as whether or not [her] absence should be charged to this approved Family Leave.*"[9]

In December 2008, Ms. Taylor-Novotny began working from home three days per week. Her "Work From Home" agreement required her to abide by all company policies and procedures and to advise Health Alliance if she were ill, had an

---

[5] *Id.* at 36.

[6] *Id.*

[7] R.31-3 at 28.

[8] *Id.* at 31.

[9] *Id.* (emphasis in original).

appointment, or encountered other interferences with her work.[10]

Six months later, in May 2009, Ms. Taylor-Novotny submitted an additional FMLA Certification to Health Alliance. Her physician noted that she had delivered a baby in April 2009 and stated that she "may miss work for appts/testing/and possibly due to [multiple sclerosis] itself."[11] Health Alliance again approved "[i]ntermittent time off as needed."[12] The approval again advised Ms. Taylor-Novotny that she had to "*let [her] manager know each time an absence from work will be necessary, as well as whether or not [the] absence should be charged to this approved Family Leave*."[13]

In her June 2009 performance evaluation, Ms. Taylor-Novotny earned an overall rating of "Achieves Requirements."[14] The evaluation warned, however, that "[t]ardiness remains an issue and concern despite numerous discussions" and that "[d]espite the fact that [Ms. Taylor-Novotny] is a salaried employee, there is still an expectation that she has

---

[10]  R.31-2 at 44–45.

[11]  R.31-3 at 38.

[12]  *Id.* at 42.

[13]  *Id.* (emphasis in original).

[14]  R.31-2 at 61. The evaluation form used by Health Alliance changed between January 2008 and June 2009. The "Achieves Requirements" rating appears to correspond on Health Alliance's new scale to her earlier "Average" rating.

predictable office hours."[15] The evaluation, which she signed, set goals for her to improve her punctuality.

Ms. Taylor-Novotony maintains that she told Health Alliance staff in early 2010 that excessive fatigue from her multiple sclerosis caused her tardiness. On March 9, 2010, Ms. Taylor-Novotny submitted a note from her neurologist, dated February 11, 2010, that specified that she should not work in the office more than two half-day periods per week.[16] At Health Alliance's request, Ms. Taylor-Novotny submitted a recertification from her neurologist, dated April 21, 2010, clarifying his recommendations. That recertification noted her "extreme [multiple sclerosis] fatigue" and recommended that her work in the office be limited to two half-days per week.[17] Health Alliance once more approved "[i]ntermittent time off as needed."[18] In addition to a standard form letter, Health Alliance's FMLA Specialist, Deb Beeson, sent Ms. Taylor-Novotny an email noting that "[w]hen you miss work for this reason,

---

[15] *Id.* at 59.

[16] *See* R.31-3 at 58. Initially, Health Alliance mistakenly read the physician's note as limiting Ms. Taylor-Novotny's time in the office to two-and-a-half days per week, rather than two half-days. The physician's recommendations were clarified at a March 19, 2010 meeting between Ms. Taylor-Novotny and management.

[17] *Id.* at 45.

[18] *Id.* at 49.

please notify your manager/director [that] it is for a Family Medical Leave (FMLA) reason."[19]

Some time in March 2010, Ms. Taylor-Novotny also began consulting with Health Alliance about ADA accommodations for her multiple sclerosis. These discussions led Health Alliance to implement several changes in Ms. Taylor-Novotny's physical work arrangement. For example, Health Alliance offered to have another employee retrieve documents from the printer and deliver mail for Ms. Taylor-Novotny. It also worked with her to reduce the files and other items that she needed to carry between her home and the office. These accommodations were successful in alleviating some of the fatigue related to Ms. Taylor-Novotny's condition. At this time, Ms. Taylor-Novotny also requested that she be allowed to use her badge scans to document her arrival times, instead of being required to inform her supervisor directly when she was late and the reason for her tardiness. Because the badge scans only recorded the time of entrance, but neither provided advance notice of, nor the reason for, the late arrival, Health Alliance refused this request.

Ms. Taylor-Novotny also met with Fletcher, Polk, and Tara Swearingen, Vice President of Human Relations, on March 19, 2010, to discuss Ms. Taylor-Novotny's continued tardiness. Swearingen reiterated that Ms. Taylor-Novotny "must contact [Fletcher] every time she will be late, her expected arrival time, and the reason for the lateness, regard-

---

[19] *Id.* at 48.

less of whether she is scheduled in the office or at home."[20] She explained that "the amount of time she is late, when due to her FMLA will be entered as FMLA leave"; however, "[t]ardiness unrelated to her FMLA, or lack of timely notification and communication is subject to disciplinary policies."[21]

Following this meeting, Ms. Taylor-Novotny arrived thirty-five minutes late for work on March 23 and seventy minutes late for work on March 30. She did not contact Fletcher on either occasion to advise her that she would be late or to provide the reason for the late arrival. As a result, Ms. Taylor-Novotny received a written warning. She refused to sign the warning because she believed it was premature in light of her ongoing negotiations with Health Alliance about accommodating her multiple sclerosis.

In April 2010, Health Alliance crafted an official attendance policy specific to FLSA-exempt employees. That policy required employees to report absences to supervisors before their scheduled shifts. Similar to the plan that had been put in place for Ms. Taylor-Novotny, the policy incorporated progressive discipline, including a verbal warning, written warning, final written warning, suspension, and termination.[22]

---

[20]  R.31-2 at 65.

[21]  *Id.*

[22]  Before that time, Health Alliance had relied on a general misconduct policy for both salaried and hourly employees. The general policy also had incorporated progressive discipline and noted that any disciplinary action, including termination, could be given independently of the others.

On May 5, 2010, Ms. Taylor-Novotny received her performance evaluation. Although she received an overall rating of "Achieves Requirements," she received a rating of "Does Not Meet Requirements" in the area of "Dependability, Compliance and Professionalism."[23] The review noted that "[t]here continues to be a concern about tardiness and notification of late arrivals" and that she was "currently under Disciplinary Action for failure to notify of tardiness and FML tracking."[24] It instructed that Ms. Taylor-Novotny had to "[i]mprove notification and tracking of late start times" and "[p]rovide advance notice of and reason for late start times and early departures."[25] The review also assessed Ms. Taylor-Novotny as "Need[ing] Improvement" in the area of "Accountability."[26] Specifically, it noted that she needed to "[i]mprove contract follow-up. … Follow-up with potential providers in accordance with departmental guidelines. Track all activities in Contract Negotiation tracking log. Identify and approach all non-contracted [hospital-based providers] and complete contracts with at least six by 12/31/10."[27] Ms. Taylor-Novotny signed the evaluation.

---

[23] *Id.* at 72–74.

[24] *Id.* at 73.

[25] *Id.*

[26] *Id.* at 71.

[27] *Id.* at 72. To assist Ms. Taylor-Novotny in meeting this goal, Fletcher set up interim deadlines for identifying and contacting hospital-based providers. *See* R.31-1 at 35–36 (Taylor-Novotny Dep. at 130–33).

On May 17, 2010, Health Alliance's Human Resources Director, Lauren Schmid, told Ms. Taylor-Novotny in an email that, if she limited her office work to two half-days per week as her neurologist had recommended in his FMLA recertification, she would need to use FMLA leave for the other half of each office day. According to Schmid, allowing Ms. Taylor-Novotny to work only two half-days in the office without taking FMLA leave did not meet Health Alliance's "business needs."[28] Specifically, Swearingen had noted in a previous, internal email that Fletcher and Polk "[we]re not comfortable" with Ms. Taylor-Novotny working from home full-time because "there is little ability to control how much work time she is actually putting in."[29]

Ms. Taylor-Novotny decided not to adopt that schedule because it would have reduced her FMLA leave bank and her overall pay.[30] Schmid also told Ms. Taylor-Novotny in the email that Health Alliance would seek further information from her physician about whether her multiple sclerosis met the ADA definition of disability. Schmid sent a letter seeking information on Ms. Taylor-Novotny's status under the ADA to her physician that same day.

On May 21, 2010, Health Alliance issued Ms. Taylor-Novotny a Final Written Warning for arriving late eight times

---

[28] R.31-3 at 62.

[29] R.32-4.

[30] Since FMLA leave is unpaid, Ms. Taylor-Novotny would have effectively reduced her pay by twenty percent by accepting the offer.

between April 13 and May 7 without notifying her supervisor about her tardiness. The warning explained that, when Fletcher repeatedly had requested Ms. Taylor-Novotny's arrival times, it took Ms. Taylor-Novotny two weeks to respond. When she did so, a comparison between her reported times and her badge scans revealed eight tardies, ranging from seven to forty-two minutes, none of which had been reported in advance to Fletcher. The Final Written Warning noted that future inaccurate reporting of her arrival times could be construed as falsification of time records or could lead to termination. It also repeated that Ms. Taylor-Novotny was required to advise Fletcher when she would be late and the reason for her tardiness.

Three days after she received the Final Written Warning, Ms. Taylor-Novotny renewed her request to use her entrance badge scans to report her work start times because "having to remember what time [she] arrived to work [wa]s just one more thing [she] ha[d] to do."[31] Health Alliance denied this request.

Ms. Taylor-Novotny filed a grievance on June 4, 2010, challenging the discipline that she had received. She noted that her tardiness "ha[d] been consistent" and "brought up on Annual Employee Evaluations" during her time at Health Alliance.[32] She further asserted that the efforts of Health Alliance to monitor her arrival times had created a hostile work environment. She concluded that her position could

---

[31]  R.31-3 at 68.

[32]  *Id.* at 6.

"clearly be done from home full time."[33] Ms. Taylor-Novotny also sent a letter to the CEO of Health Alliance on July 2, complaining that she had been singled out for adverse actions even though "time theft [wa]s rampant" in the company.[34]

Ms. Taylor-Novotny's punctuality problems continued in June and July. Health Alliance documented and brought to her attention repeated discrepancies between her reported work arrival times and her badge scans. Specifically, on June 21, 2010, Schmid questioned her about the reported arrival times for June 1 and June 8, for which her badge scans revealed she was forty-six and twenty-eight minutes late, respectively. According to Schmid's documentation of that meeting, Ms. Taylor-Novotny "indicated that she was not certain what had happened and attributed the discrepancies in reporting her time to a misunderstanding, a rounding error, a typo, or her medical condition."[35]

Less than ten days after her meeting with Schmid, Ms. Taylor-Novotny was working from home on June 28, 2010, and did not log onto her computer until 12:42 p.m., four hours and twelve minutes after her designated start time. Ms. Taylor-Novotny later attributed this discrepancy in time to internet connectivity problems. Nevertheless, she failed to report the issue to her supervisor as required by Health

---

[33] *Id.* at 7.

[34] R.31-2 at 22.

[35] R.31-3 at 9.

Alliance's work at home policy.[36] A few weeks later, Ms. Taylor-Novotny reported a start time of 1:15 p.m., but did not log on to her computer until 1:45 p.m. She attributed this discrepancy to a typo.

In a letter dated July 13, 2010, Ms. Taylor-Novotny's physician responded to Schmid's inquiry from May about Ms. Taylor-Novotny's limitations. He wrote that she suffered "very poor energy and stamina."[37] He suggested "a flexible work schedule that would allow her to work efficiently when she is doing well but then allow rest periods when she is having a bad day."[38]

Polk terminated Ms. Taylor-Novotny's employment on July 30, 2010. In its termination letter, Health Alliance informed her

---

[36] Specifically, that policy provides:

> 4.5. On any occasion when the telecommuter cannot access the computer network due to technical problems, or the Designated Work Area is not available, the telecommuter must promptly contact his or her supervisor for direction and may be required to report for work at the home office as determined by the supervisor. Where reporting to work is not practical, the telecommuter may be required to take paid leave consistent with time and attendance policies.

R.31-2 at 49.

[37] R.31-3 at 70.

[38] *Id.*

that it was removing her because of her continued tardiness and failure to report accurately her work time. It detailed the history of these issues as well as Ms. Taylor-Novotny's infractions since Health Alliance had issued her a final written warning in late May. Additionally, Health Alliance stated that it was terminating her for "Falsifying Departmental Documents" and "Poor Work Performance."[39] The termination letter noted that an audit of Ms. Taylor-Novotny's work phone records suggested that she had falsified records of calls that she claimed to have made to providers. It identified thirty-two different calls that she had reported making between June 14 and July 26 that were not documented in her work phone records.[40] It also listed specific occasions when Ms. Taylor-Novotny had falsified reporting logs about her work efforts. During June and July 2010, she reported that she had updated eight fee schedules for clients before she actually had completed her work. In two cases, she did not complete her work until more than a month after her reported completion date.

With respect to her performance, Health Alliance noted that Ms. Taylor-Novotny repeatedly had failed to meet interim deadlines set by Fletcher for accomplishing the goal of securing contracts with six hospital-based providers. Moreover, she had failed to update paperwork designed to track her progress. The termination letter also stated that there had been complaints

---

[39]  *Id.* at 10.

[40]  Ms. Taylor-Novotny claims that she made the calls from her personal cell phone while working from home.

from providers and other employees concerning
Ms. Taylor-Novotny's lack of responsiveness.[41]

After Ms. Taylor-Novotny's employment was terminated,
her position was filled by Jared Fritz, a white male.


**B. District Court Proceedings**

Ms. Taylor-Novotny filed a five-count complaint against
Health Alliance in which she alleged that it had failed to
reasonably accommodate her multiple sclerosis and had
retaliated against her for seeking an accommodation, in
violation of the ADA; that it had interfered with her rights
under the FMLA; and that it had terminated her employment
on the basis of her race and disability, in violation of Title VII
and the ADA.

Following discovery, Health Alliance moved for summary
judgment on all counts, and the district court granted the
motion. Turning first to the ADA claims, the court noted that,
in order to prevail on any of those claims—disparate treatment,
failure-to-accommodate and retaliation—the plaintiff had to
establish that "she was a qualified individual who, with or
without reasonable accommodation, could perform the
essential functions of the employment position."[42] The court
concluded that Ms. Taylor-Novotny could not meet her

---

[41] *See id.* at 11.

[42] R.39 at 5.

burden.[43] The district court additionally determined that Ms. Taylor-Novotny's requested accommodations were not reasonable. With respect to her discrimination and retaliation claims, the court held that, because she was not meeting her employer's legitimate expectations, she could not make out a prima facie case. Turning to her FMLA claims, the court concluded that Ms. Taylor-Novotny's admission that she never had been denied the opportunity to take FMLA leave was fatal to her claim.

Ms. Taylor-Novotny timely appealed the district court's judgment.

## II

## DISCUSSION

We review the district court's summary judgment order de novo. *Chaib v. Indiana*, 744 F.3d 974, 981 (7th Cir.), *cert. denied*, 135 S. Ct. 159 (2014).[44] Summary judgment is appropriate when the admissible evidence shows that there is no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014). A material fact is one that affects the outcome of the suit. *Id.* Summary judgment is inappropriate when, based on the evidence in the record, a reasonable jury could return a verdict for the nonmoving party. *Id.* at 682.

---

[43] *Id.*

[44] The district court had jurisdiction under 28 U.S.C. §§ 1331 & 1343. Our jurisdiction over this appeal is secure under 28 U.S.C. § 1291.

"In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party." *Id.*

## A. ADA Discriminatory Discharge

We turn first to Ms. Taylor-Novotny's claim that Health Alliance terminated her employment on the basis of her disability in violation of the ADA. The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of [her] disability in regard to … discharge … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. "A plaintiff claiming disparate treatment in violation of the ADA can rely on two different methods of proof to survive a summary judgment motion." *Bunn*, 753 F.3d at 683.

> The first is the "direct method," in which a plaintiff must show that a genuine issue of material fact exists with respect to each of the three elements he will eventually be required to prove at trial: (1) that the plaintiff is disabled within the meaning of the ADA; (2) that the plaintiff is qualified to perform the essential functions of the job with or without accommodation; and (3) that the plaintiff has suffered an adverse employment action because of his disability.

*Id.* The second method is the "'indirect method,' originally developed in the Title VII context by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* at 685 (parallel citations omitted). According to this method, the employee first must establish a prima facie case by showing that: (1) "the plaintiff

was a qualified individual with a disability" within the meaning of the ADA, *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006); (2) she was meeting her employer's legitimate expectations, *see Bunn*, 753 F.3d at 685; (3) she nevertheless suffered an adverse employment action, *see id.*; and (4) similarly situated, non-disabled employees were treated more favorably,[45] *see id.*

With respect to her disability discrimination claims, Ms. Taylor-Novotny proceeds using only the indirect method. We turn first, therefore, to whether Ms. Taylor-Novotny is disabled under the ADA.

## 1.

Here the parties do not dispute that Ms. Taylor-Novotny's multiple sclerosis is a "disability" within the meaning of the Act. *See* 42 U.S.C. § 12102(1) (defining "disability"). They do dispute, however, whether Ms. Taylor-Novotny is a "qualified individual" with a disability—"an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Id.* § 12111(8).

Ms. Taylor-Novotny maintains that she has established that she is a qualified individual with a disability. Claiming that our case law establishes that "regular attendance is not an

---

[45] We have observed that this fourth element may be satisfied by other "circumstances [that] suggest that the plaintiff's disability was the reason the employer took [the] adverse action." *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127–28 (7th Cir. 2006). Ms. Taylor-Novotny, however, relies only on comparators to establish this element of her prima facie case.

essential function of every job,"[46] she maintains that regular attendance and punctuality were not essential functions of her position. She points out that Health Alliance had a work-from-home policy that allowed for flexible arrangements. Consequently, her inability to come regularly to the Health Alliance office did not establish that she could not perform the essential functions of her job.

We cannot agree. Ms. Taylor-Novotny has not established that regular attendance was not required of someone in her position and the record certainly demonstrates that she could not perform this essential function. We have said that

> [a]n employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance. A plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes.

*Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (citation omitted).[47] Health Alliance's willingness to allow

---

[46] Appellant's Br. 11 (citing *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 900 (7th Cir. 2000)).

[47] We have noted a few possible exceptions to this rule such as substitute teachers, employees who perform "piecework," and "[p]eople who work for temporary help agencies." *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 957 (7th Cir. 2001) (en banc) (Wood, J., dissenting in part and concurring in part). Ms. Taylor-Novotny's position does not fit into any of these categories.

employees to work at home, consistent with its "Work at Home" policy, hardly establishes that punctuality and regular attendance are not essential functions of her position. Indeed, the work-at-home policy specifically required workers to adhere to an agreed-upon work schedule, "to be accessible by phone, e-mail, voice mail, pager, or modem" during that schedule and to "attend staff meetings and applicable educational in-services" either by telephone or in person "as needed by the organization."[48] Additionally, Health Alliance regularly evaluated its employees on "Attendance and Punctuality."[49] Her failure to conform to these standards was the cause of her employer's displeasure.

The ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n). Health Alliance considered it essential that, regardless whether an employee was working from the Health Alliance office or from home, the employee be accessible at regular times to supervisors, staff, and customers. Ms. Taylor-Novotny has not identified any evidence in the record that suggests otherwise.[50] Additionally,

---

[48] R.31-2 at 49.

[49] *See id.* at 30, 36. In 2009, Health Alliance began using a new evaluation tool that used the heading "Dependability, Compliance and Professionalism." *See id.* at 59. Incorporated within this category was whether the employee "[a]dhere[d] to the organizations' policy on attendance and tardiness." *Id.*

[50] Ms. Taylor-Novotny points to the job description for a Contract Specialist I and notes that compliance with company policies, designated as the sixth

(continued...)

she has not pointed to evidence in the record that there was an accommodation that would allow her to meet this requirement. Indeed, the last word from Ms. Taylor-Novotny's physician was that she was suffering from "very poor energy and stamina" and suggested a "flexible work schedule that would allow her to work efficiently when she is doing well but then allow rest periods when she is having a bad day."[51] Given this evidence in the record, we cannot conclude that Ms. Taylor-Novotny could satisfy the essential function of regular attendance and, therefore, is not a qualified individual with a disability entitled to protection under the ADA.

**2.**

Even assuming, however, that Ms. Taylor-Novotny is a qualified individual with a disability within the meaning of the Act, we cannot conclude that she has established the remainder of her prima facie case. In order to establish a prima facie case of disability discrimination, Ms. Taylor-Novotny also must

---

[50] (...continued)
"Essential Function" of the position, "is written in standard boiler plate language and applies to all employees—not just Contract Specialists." Reply Br. 17. She concludes that "this sixth essential job function is really not essential only for that job and should not be listed as an essential job function." *Id*. Ms. Taylor-Novotny provides no authority for such an approach, and, as we have set forth, the evidence in the record supports Health Alliance's assertion that it considered accountability in the area of attendance and punctuality essential.

[51] R.31-3 at 70.

establish that she was meeting Health Alliance's legitimate expectations.

Ms. Taylor-Novotny maintains that she established this element because she received overall ratings on her performance evaluations of "Average" or "Achieves Requirements." The record, however, is replete with evidence that Health Alliance was not satisfied with Ms. Taylor-Novotny's continued failures to arrive to work on time without notifying her supervisor. Ms. Taylor-Novotny received a rating of "Marginal" for attendance and punctuality on her very first performance evaluation. Her failure both to arrive at work on time and to alert her supervisor in advance of late arrivals were concerns articulated on every review Ms. Taylor-Novotny received and in several disciplinary meetings. Her last evaluation clearly informed her that she was not meeting Health Alliance's requirements in the area of "Dependability, Compliance and Professionalism."[52] The review identified problems with "tardiness and notification of late arrivals" and reiterated that she was "currently under Disciplinary Action for failure to notify of tardiness and FML tracking."[53] It instructed that Ms. Taylor-Novotny had to "[i]mprove notification and tracking of late start times" and "[p]rovide advance notice of and reason for late start times and early departures," effective immediately.[54] There is no question that, even if the other aspects of Ms. Taylor-Novotny's work performance were

---

[52] R.31-2 at 72–73.

[53] *Id.* at 73.

[54] *Id.*

adequate, she was not meeting Health Alliance's legitimate expectations that she arrive at work on time and, when she was not able to, that she notify her supervisor in advance of the delay.

Moreover, upon examination of the reports that she did make, the company concluded that it could not trust the accuracy of the reports that she was making. In its letter terminating Ms. Taylor-Novotny's employment, Health Alliance noted four occasions since her final written warning when she failed to report her time accurately, both on days that she reported to work and on days that she worked from home.[55] There were also significant inaccuracies in Ms. Taylor-Novotny's "Contract Negotiation Tracking Sheet": The report indicated that she had made thirty-two calls to providers; however an audit of her work telephone records indicated that the calls were not made.[56] Finally, Ms. Taylor-Novotny repeatedly had failed to meet interim deadlines set by her supervisor in order to complete contracts with hospital-based providers by year end.[57] In sum, Ms. Taylor-Novotny not only failed to meet Health Alliance's expectations on punctuality and accountability, but she had serious difficulties accurately accounting for her time, accurately reporting her work activi-

---

[55]  *See* R.31-3 at 9.

[56]  *Id.* at 10.

[57]  *See id.* at 10–11.

ties, and meeting deadlines. On this record, Health Alliance's legitimate expectations clearly were not met.[58]

**3.**

Ms. Taylor-Novotny submits, however, that even if her tardiness and her lack of communication with her supervisor were serious shortcomings in her performance, those shortcomings were shared by at least one comparable employee, Heather Wantland-Welch, whose employment was not terminated. "When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). "To meet his burden of demonstrating that another employee is 'similarly situated,' a plaintiff must demonstrate that there is someone who is directly comparable to him in all material respects." *Id.* at 819.

Ms. Taylor-Novotny submits that Wantland-Welch is comparable because they both held the same job title, they "were hired at approximately the same time, performed the

---

[58] Our conclusion on this element also forecloses Ms. Taylor-Novotny's claim that her employment was terminated on the basis of her race. As with an ADA discrimination claim, in order to establish a prima facie case of racial discrimination under the indirect method, Ms. Taylor-Novotny must establish that she was meeting her employer's legitimate expectations. *See, e.g., Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 511 (7th Cir. 2012). Because she cannot meet this burden, her race claim also fails.

same type of tasks, … worked in the same department," and "had Jeff Polk as their department manager."[59] Additionally, Ms. Taylor-Novotny submits, they were treated inconsistently because "Wantland-Welch … had numerous tardies, yet, … received no disciplinary actions"; indeed, she notes, Wantland-Welch was also "allowed to 'make-up' time taken as FMLA leave."[60]

We do not believe that Ms. Taylor-Novotny has met her burden of establishing that she and Wantland-Welch were similarly situated. We note initially that, although Ms. Taylor-Novotny asserts that Wantland-Welch was not disciplined and was "allowed" to make up work, the record does not bear this out. Wantland-Welch testified that she was "written up" for "[b]eing late" and was not given "the opportunity to make up missed hours."[61]

Moreover,"[w]e have cautioned that, in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings." *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (internal quotation marks omitted). The record establishes that Wantland-Welch's problem with tardies began in 2010, and, during the first seven months of the year,

---

[59]  Appellant's Br. 14.

[60]  *Id.* at 15.

[61]  R.32-2 at 6, 4 (Wantland-Welch Dep. 23, 21). Wantland-Welch did state that she had been *required* to work additional hours at the office "to make up for time that [she] was out of the office for FMLA." *Id.* at 4 (Wantland-Welch Dep. 21).

she was tardy forty-nine times.[62] However, Ms. Taylor-Novotny does not point to any evidence in the record that, prior to 2010, Wantland-Welch had any difficulties with punctuality. Furthermore, Wantland-Welch, unlike Ms. Taylor-Novotny did not "fail[] to call in."[63] Wantland-Welch, therefore, did not have Ms. Taylor-Novotny's history of poor punctuality, nor did she share Ms. Taylor-Novotny's lack of accountability. Consequently, she is not comparable to Ms. Taylor-Novotny for purposes of disciplinary action.

Ms. Taylor-Novotny has not met her burden of establishing that she is disabled, that she was meeting Health Alliance's legitimate expectations or that other, similarly situated employees were treated more favorably than she was treated. The district court, therefore, correctly granted summary judgment to Health Alliance on Ms. Taylor-Novotny's discriminatory discharge claims.

## B. ADA Failure to Accommodate

We turn now to Ms. Taylor-Novotny's claim that Health Alliance failed to accommodate her multiple sclerosis. The ADA requires employers to make reasonable accommodations for a qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A); *see also id.* § 12111(9) (giving examples of "reasonable accommodation[s]"). As noted previously, an employee is a qualified individual with a disability if, "with or

---

[62] *See* R.33-2.

[63] R.32-2 at 2 (Wantland-Welch Dep. 19).

without reasonable accommodation, [she] can perform the essential functions of the [job]." *Id*. § 12111(8); *see also Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013). Ms. Taylor-Novotny bears the initial burden of establishing that she was a qualified individual who could perform the essential functions of her position. *Majors*, 714 F.3d at 534. Once she has shown that she is a qualified individual with a disability, she then must show that her employer was aware of her disability but failed to afford her a reasonable accommodation. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

Assuming that Ms. Taylor-Novotny is a qualified individual with a disability under the ADA,[64] we examine whether Health Alliance reasonably accommodated her multiple sclerosis. Ms. Taylor-Novotny must make an initial showing that the accommodation she sought was "reasonable on its face." *Majors*, 714 F.3d at 535 (internal quotation marks omitted). If she makes that showing, Health Alliance has the burden to establish that the accommodation would have created an undue hardship on its business. *Id.*

The record establishes that Health Alliance made good-faith efforts to accommodate Ms. Taylor-Novotny's multiple sclerosis: It sought information from her physician about her needs; it participated in the interactive process; and it made several adjustments to Ms. Taylor-Novotny's physical surroundings. Indeed, Ms. Taylor-Novotny identifies only one other accommodation—using her badge scans to report her

---

[64] For the reasons stated in Part II.A.1., we do not believe that Ms. Taylor-Novotny has met this burden.

arrival times—which, she claims, was reasonable, but that Health Alliance refused.

Health Alliance's refusal to accept this accommodation did not violate the ADA for one basic reason: Ms. Taylor-Novotny never identified any limitation related to her disability that this accommodation would alleviate. Ms. Taylor-Novotny, as well as her physician, stated that she was suffering from fatigue related to her multiple sclerosis. As there was no physical exertion attendant to calling Fletcher to alert her to an antici-pated late arrival, she does not explain how the use of her badge scans would alleviate her illness-related fatigue.

Ms. Taylor-Novotny claims, however, that, in addition to her physical fatigue, she was suffering problems with "her memory and mental fatigue," which made her unable to comply with Health Alliance's reporting requirement.[65] Ms. Taylor-Novotny has pointed to no evidence in the record that establishes that she was suffering from memory loss, that she was experiencing mental fatigue, or that she communi-cated these limitations to Health Alliance. Her counsel ac-knowledged an absence of evidence on this point at oral argument. Ms. Taylor-Novotny nevertheless maintains that, because Health Alliance "deals in matters in the health and health insurance industry" and because another subsidiary of its parent company is a direct provider of health care services, Health Alliance either should have known that mental fatigue was attendant to multiple sclerosis or, at the very least, "ha[d]

---

[65]  Reply Br. 16.

the capabilities to understand the symptoms of [multiple sclerosis]."[66]

We cannot reconcile the approach suggested by Ms. Taylor-Novotny with the language of the statute or our interpretive case law. We have held that "[t]he language of the ADA itself demonstrates that a reasonable accommodation is connected to what the *employer knows* about the *specific limitations* affecting an employee who is a qualified individual with a disability." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005) (emphasis added). Moreover, we have explained that

> "[s]ome impairments may be disabling for particular individuals but not for others, depending on the stage of the disease or the disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors." 29 C.F.R. 1630.2(j), App. (1995). Thus, while a given disability may limit one employee (and therefore necessitate a reasonable accommodation), it may not limit another. For this reason, the ADA does not require an employer to assume that an employee with a disability suffers from a limitation. In fact, better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs.

---

[66] *Id.* at 15.

*Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 898 (7th Cir. 2000) (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164–65 (5th Cir. 1996)). Here, Ms. Taylor-Novotny provided Health Alliance with no evidence that her multiple sclerosis was affecting her ability to remember or causing her mental fatigue. On the record before us, therefore, Ms. Taylor-Novotny's request to use her badge scans was not a reasonable accommodation of her multiple sclerosis.[67]

**C. ADA Retaliation**

Ms. Taylor-Novotny also maintains that Health Alliance violated the ADA by terminating her employment in retaliation for her request for accommodation. *See* 42 U.S.C. § 12203(a). Although retaliation may be shown either through the direct method or the indirect method, *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011), Ms. Taylor-Novotny proceeds only under the direct method of proof. Under that method, an employee must show that "(1) she engaged in statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013). Both parties agree that Ms. Taylor-Novotny engaged in protected activity by request-

---

[67] We also note that the badge scans only recorded the time Ms. Taylor-Novotny arrived, but did not provide an explanation for any late arrival. Consequently, use of the badge scans would not have satisfied Health Alliance's need to have Ms. Taylor-Novotny account for her tardiness and to designate whether it fell within her FMLA leave.

ing ADA accommodations and that she suffered an adverse employment action through termination.[68]

To show causation under the direct method, an employee must show that her protected activity was a "substantial or motivating factor" behind the adverse employment action. *Id.* She can do so by presenting either a direct admission of a retaliatory motive or a "convincing mosaic" of circumstantial evidence supporting an inference that a retaliatory animus was at work. *Id.* (internal quotation marks omitted). Our case law has identified three general categories of circumstantial evidence: (1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn"; (2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently"; and (3) "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* Ms. Taylor-Novotny focuses on the first category—suspicious timing and ambiguous statements.

---

[68] Ms. Taylor-Novotny also argues that she suffered an adverse action by being denied a pay increase in 2010 because she was under discipline at the time. Appellant's Br. 18. Ms. Taylor-Novotny's claim is not supported by argument, evidence, or relevant authorities. It is, therefore, waived. *See, e.g.,* *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008) ("This argument is perfunctory and undeveloped, and is therefore waived."). Even if we were to consider the claim on the merits, however, it fails because, as explained in this section, there is no evidence that such an action was retaliatory.

**1.**

Ms. Taylor-Novotny submits that it is suspicious that, after years of documented tardiness, Health Alliance first issued verbal and written warnings in March 2010, around the time that she officially requested ADA accommodations for her multiple sclerosis. According to Ms. Taylor-Novotny, "if tardiness and reporting of tardiness was such a major issue …, then disciplinary actions against [her] should have commenced long before March 19 & 30, 2010."[69]

The record does not support this contention. Ms. Taylor-Novotny *was disciplined* as early as October 2007 for her tardiness.[70] At that point, a "Corrective Action Plan" was implemented that included Ms. Taylor-Novotny checking in

---

[69] Appellant's Br. 19.

[70] Ms. Taylor-Novotny also maintains that Health Alliance failed to follow its own policy on progressive discipline because her "'verbal warning' and 'written warning' were premature (i.e., prior to any attendance policy for Exempt employees)." *Id.* at 21. It is true that when Health Alliance verbally counseled Ms. Taylor-Novotny and later issued a written warning, it had not yet implemented a formal attendance policy for exempt employees. Because that policy did not exist, there could be no deviations from that policy that might raise an inference of discriminatory or retaliatory intent. *Cf. Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) ("Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent."). Moreover, the progressive approach of Health Alliance's discipline was consistent both with the Corrective Action Plan that it previously had outlined for Ms. Taylor-Novotny and was consistent with the approach set forth in its formal attendance policy adopted in April 2010. *See supra* pp. 4, 10.

with her supervisor every time she was late.[71] As well, her personnel file establishes that she had been notified at each of her performance reviews about the company's dissatisfaction with her tardiness and accountability.

More importantly, however, suspicious timing must be evaluated in the context of the whole record. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 507 (7th Cir. 2004) (concluding that suspicious timing of employee's termination did not create an issue of fact because "the undisputed evidence shows that he was on the brink of discharge before anyone at [his employer] knew that he had AIDS"). Standing alone, it "rarely is sufficient to create a triable issue." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (internal quotation marks omitted). The record here establishes that this is not such a "rare[]" case. *Id.* (internal quotation marks omitted).

Although the interactive process for accommodations officially began in March 2010, Health Alliance had been aware of Ms. Taylor-Novotny's multiple sclerosis since at least May 2008, when she submitted an FMLA certification and request. During the next two years, Health Alliance approved FMLA time to be used as needed, adjusted her schedule, and approved a work-from-home schedule—all in an effort to assist Ms. Taylor-Novotny in addressing the effects of her condition. Moreover, once the ADA interactive process began, Health Alliance accommodated Ms. Taylor-Novotny's condition in

---

[71]  *See supra* p. 4 (citing R.31-2 at 33).

numerous ways that helped alleviate the fatigue attendant to her multiple sclerosis.

Finally, the record establishes that Health Alliance's concern with Ms. Taylor-Novotny's punctuality and accountability predates her request for reasonable accommodation by several years. Prior to Ms. Taylor-Novotny's request for reasonable accommodation, she was warned numerous times that her accountability for her tardies was substandard. We have recognized that a case based on suspicious timing is particularly weak where a plaintiff's protected activity follows "a performance warning for the very same conduct that ultimately led to h[er] termination." *Id.*

**2.**

Ms. Taylor-Novotny maintains that, although suspicious timing is the main thrust of her retaliation claim, there is substantiating evidence of discriminatory animus in emails that Health Alliance staff exchanged in March 2010.[72] These emails document a suggestion on March 18, 2010, from Swearingen, Vice President of Employee Relations, that Health Alliance should obtain a "second opinion in regards to [Ms. Taylor-Novotny's] restrictions."[73] According to the email, Ms.

---

[72] Health Alliance contends that the emails are inadmissible because they were not authenticated and they are hearsay. Appellee's Br. 29. Even if the emails are considered, however, Ms. Taylor-Novotny lacks sufficient evidence of retaliation.

[73] R.32-4 at 1.

Taylor-Novotny's supervisors felt she was "getting whatever she asks for from her physician" and were "fustrat[ed]" due to "her lack of communication in regards to her FMLA" and the "feel[ing] that she is taking advantage of the situation."[74]

This email, while perhaps suggestive of irritation or doubt about Ms. Taylor-Novotny's medical needs, cannot support a claim of retaliation when it is evaluated in context. The focus of the email is Ms. Taylor-Novotny's need for, and possible abuse of, FMLA leave. This is a reasonable business concern of an employer, one that the FMLA itself acknowledges and accommodates. Section 2613(c)(1) of Title 29 provides:

> In any case in which the employer has a reason to doubt the validity of the certification … for leave …, the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer concerning any information certified … for such leave.

Here, the employer, faced with accountability problems, simply discussed whether it ought to exercise a statutory right under the FMLA and seek verification that the request for leave was legitimate.[75]

---

[74] *Id.*

[75] Ms. Taylor-Novotny also points to an email by Swearingen in which she states, "Well, this is the first time that Kiersten has mentioned the ADA, so I imagine she is getting some guidance." Appellant's Br. 20 (internal quotation marks omitted) (quoting R.32-14). Ms. Taylor-Novotny does not

(continued...)

**3.**

Finally, Ms. Taylor-Novotny contends that she was not informed of all of her work performance problems before she received her termination notice and that this failure on the part of the company is evidence of Health Alliance's retaliatory motive. The record does not support this argument.

Health Alliance's letter terminating Ms. Taylor-Novotny's employment listed her poor work performance as one of the bases for her termination and specifically set forth her failure to achieve interim goals for identifying and contacting

---

[75] (...continued)

explain the significance of this statement, and we perceive none. Indeed, placed in context, it appears to be an indication that Health Alliance needed to continue to consider seriously Ms. Taylor-Novotny's requests; the email reads:

> Well, this is the first time that Kiersten has mentioned the ADA, so I imagine she is getting some guidance. From this note it appears that she is asking for 9:00 on the days she's at home. When we last spoke she asked for all days to start at 9:00 am. Kim, my understanding is that we are waiting for additional feedback from the physician before responding to a request for a change in hours. Did you have a chance to meet with her on Friday?

> I hate to bow out just as this is coming to a head, but [I] do think that this needs to be handled within the HR department with people that will be working through this long term. I'll let Kiersten know that I am forwarding her request to Kim and that she will follow up with her.

R.32-14.

hospital-based providers. Ms. Taylor-Novotny's deposition testimony makes clear that she was aware of both of these interim goals. She was asked if she recalled discussions with Fletcher concerning identifying hospital-based providers "as an independent goal to further the overall goal of negotiating six contracts for 2010"; Ms. Taylor-Novotny responded, "Yes."[76] She also testified to informing Fletcher that she "wouldn't be able to meet … deadlines" related to mailing contracts, which she acknowledged "[w]as the next step … in the contracting process."[77]

In sum, the record does not support a determination that Ms. Taylor-Novotny's termination was retaliatory. An examination of the evidence yields no basis for the inferences that Ms. Taylor-Novotny would ask a jury to draw.[78]

### D. FMLA Interference Claim

We next consider Ms. Taylor-Novotny's claim that Health Alliance interfered with her FMLA leave. The district court granted summary judgment for Health Alliance because, in its view, her admission that Health Alliance never had denied her

---

[76] R.31-1 at 35 (Taylor-Novotny Dep. at 130–31).

[77] *Id.* at 35–36 (Taylor-Novotny Dep. at 132–33).

[78] Ms. Taylor-Novotny dedicates one sentence in her opening brief to her FMLA retaliation claim. As it is undeveloped and unsupported by authority, it is waived. *See, e.g.*, *Argyropoulos*, 539 F.3d at 738. We note, however, that the reasons that make Ms. Taylor-Novotny's ADA retaliation claim untenable apply with equal force to her FMLA retaliation claim.

the opportunity to take FMLA leave was "fatal to her claim."[79] We agree.

The FMLA requires employers to allow employees to take up to twelve weeks of unpaid leave for serious health conditions during any twelve-month period. 29 U.S.C. § 2612(a)(l). Employers may not interfere with an employee's rights under the FMLA or discriminate against employees who need FMLA leave. *Id.* § 2615. "To prevail on an FMLA interference claim, an employee must show that her employer deprived her of an FMLA entitlement." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 761 (7th Cir. 2008). Specifically, the "employee must establish that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Id.*

Ms. Taylor-Novotny maintains that Health Alliance interfered with her FMLA leave because it denied her request to limit her office time to two one-half days per week. She claims that, if she were "only running 30 minutes late on one of those mornings," then she should only have to use "½ hour of FMLA time and only use ½ hour of pay, instead of four hours of FMLA time and four hours of pay."[80]

In order to make out an interference claim, Ms. Taylor-Novotny had to show that she made a request

---

[79] R.39 at 8.

[80] Appellant's Br. 22.

under the FMLA and that Health Alliance denied that request. During the 2010 recertification process for Ms. Taylor-Novotny's FMLA leave, her physician recommended that Ms. Taylor-Novotny's office time be limited to two half-days per week. Consistent with her physician's suggestion, Health Alliance approved FMLA leave for the two half-days when she would not be in the office.

Ms. Taylor-Novotny, however, declined to use her FMLA leave for the two half-days. Instead, Ms. Taylor-Novotny sought to alter her basic work-at-home arrangement so that she could work from home three full days and two half-days and be compensated for all of that time. Ms. Taylor-Novotny's request for this arrangement, therefore, was not a request under the FMLA, which requires employers only to provide up to twelve weeks of *unpaid leave*. Consequently, when Health Alliance denied that request, it did not deny Ms. Taylor-Novotny any right under the FMLA.

Ms. Taylor-Novotny also appears to contend that the result of Health Alliance's denial of her request to alter her work-at-home schedule was that she would be forced to take four hours of FMLA leave every time she was late only by one-half hour. If Health Alliance had reduced her FMLA leave by half-day increments every time she was late by just a few minutes, she might have been able to make out an interference claim. But there is simply no evidence in the record, however, that such a leave deduction ever occurred. On multiple occasions, Health Alliance had approved "intermittent time off as needed to

manage [her] condition as specified by [her] physician."[81]
Health Alliance noted, however, that it was Ms. Taylor-
Novotny's "*responsibility to let [her] manager know each time an*
*absence from work will be necessary, as well as whether or not [her]*
*absence should be charged to this approved Family Leave.*"[82] Health
Alliance's approach to Ms. Taylor-Novotny's tardies never
changed.[83] All Ms. Taylor-Novotny had to do was to inform
her supervisor both that she was running late and that her
delay was due to her condition. If that occurred,
Ms. Taylor-Novotny's tardy would be excused, and only that
amount of time that Ms. Taylor-Novotny actually was late
would be deducted from her FMLA balance.

Finally, Ms. Taylor-Novotny claims that Health Alliance
interfered with her FMLA rights by not permitting her to use
her badge scans to report her work hours. As we noted
previously, the badge scans only recorded the time of entry,
not the reason for Ms. Taylor-Novotny's late arrival. Conse-
quently, the badge scans could not provide Health Alliance
with the information that it needed to determine whether
Ms. Taylor-Novotny's tardiness should be charged as FMLA
leave. More importantly, however, this requirement did not
deny Ms. Taylor-Novotny any right provided in the FMLA.
Therefore, it cannot be the basis for an interference claim.

---

[81] R.31-3 at 31.

[82] *Id.* (emphasis in original).

[83] *See* R.31-2 at 66 (Swearingen memo) (noting that late arrivals attributable
to Ms. Taylor-Novotny's multiple sclerosis would be treated as FMLA);
R.31-3 at 48–49 (approval of recertification).

## Conclusion

The judgment of the district court is affirmed. The defendant may recover its costs in this court.

AFFIRMED