**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 14, 2015[*]
Decided April 16, 2015

**Before**

RICHARD A. POSNER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 14-3328

| | |
|---|---|
| MIRZA N. BAIG, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Illinois, |
| | Eastern Division. |
| *v.* | |
| | No. 08-cv-4206 |
| THE COCA-COLA COMPANY, | |
| *Defendant-Appellee*. | John Z. Lee, |
| | *Judge*. |

**O R D E R**

Blue Springs Water Company sold bottled water under the name "Naturally Zero Canadian Natural Spring Water" between 1998 and 2004. The company's owner, Mirza Baig, has sued the Coca-Cola Company for trademark infringement in violation of the Lanham Act, *see* 15 U.S.C. § 1125(a). He alleges that the names that Coca-Cola has given to its line of zero-calorie products, including Coke Zero and Sprite Zero, are confusingly

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C).

similar to his Naturally Zero brand. The district court granted summary judgment to Coca-Cola. Because we agree with the district court that Naturally Zero is not a protectable mark, we affirm.

We review the evidence in the light most favorable to Baig. *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 488 (7th Cir. 2014). Baig first decided to use the "Naturally Zero" mark in 1997. That year he filed an application with the United States Patent and Trademark Office seeking to register the mark "Naturally Zero Canadian Natural Spring Water." (He later disclaimed "Canadian Natural Spring Water" from the application.) He chose the name in part because it signaled the quality and purity of the product. The Patent and Trademark Office told Baig to disclaim the phrase "Naturally Zero" and the numeral "0" from his application because "zero" and "0" are "widely used and recognized [as] merely descriptive," and "Naturally" is generic. When Baig did not respond, his application was deemed abandoned.

Baig and Blue Springs began to sell bottled spring water with the unregistered mark in 1998. They sold the product in the Chicago metropolitan area, southern Wisconsin, and northwestern Indiana, primarily in the summer months. Blue Springs sold about 500,000 bottles of water, grossing less than $150,000 over its brief run from 1998 to 2004. (Industry data from the same period suggests that the U.S. market for bottled water generated over $48 billion in revenue. *See Market Report Findings,* INTERNATIONAL BOTTLED WATER ASSOCIATION, http://www.bottledwater.org/economics/industry-statistics (last visited April 7, 2015).) The product received modest publicity, appearing in three beverage trade magazines in 1999, displaying at three trade shows in 2001 and 2002, and entering into a publicity campaign with the American Kidney Foundation. Baig also created brochures advertising the product, which he handed out at gas stations. He hoped that this publicity would lead to a deal with Coca-Cola in December 2002, but Coca-Cola was uninterested.

Sales of Naturally Zero ended in 2004, just when sales from Coca-Cola's zero-line of products started with Diet Sprite Zero in September 2004. For about one month in 2004, Diet Sprite Zero and Naturally Zero were sold at the same time; the last sale of Baig's Naturally Zero water occurred in October 2004. Baig testified that he never resumed sales because he did not have the necessary capital, he was ill and could not work for some of the years after 2004, and Coca-Cola's zero-line of products effectively forced his company out of the market. He tried to work with a Chicago business owner to launch "Naturally Zero Cola" in 2010, but nothing came of that arrangement.

When Baig saw a billboard advertisement for Diet Sprite Zero in September 2004, he contacted Coca-Cola to threaten litigation over its purported infringement of his mark. Below are pictures of "Diet Sprite Zero" and "Naturally Zero."

 

Baig eventually followed through on his threat to litigate when he and Blue Springs sued Coca-Cola for trademark infringement under the Lanham Act, *see* 15 U.S.C. § 1125(a). Coca-Cola moved for summary judgment on the complaint. In granting that motion, the district court ruled that the phrase "Naturally Zero" is merely descriptive of bottled water,[1] and Baig and Blue Springs could not establish that the phrase had developed secondary meaning. Alternatively, the court ruled, the plaintiffs had abandoned any rights they had by stopping all sales in 2004.[2] Baig appealed, but because he is proceeding pro se, Blue Springs is not participating. *See Georgakis v. Ill. State Univ.*, 722 F.3d 1075, 1077 (7th Cir. 2013); *United States v. Hagerman*, 545 F.3d 579, 581 (7th Cir. 2008).

Before we turn to the merits of the appeal, we pause briefly to consider an issue of appellate jurisdiction. Coca-Cola brought a counterclaim against Baig and Blue Springs. In granting summary judgment to Coca-Cola on the plaintiffs' complaint, the district

---

[1] Baig does not contest this finding on appeal, so we do not reach the issue whether "Naturally Zero" is suggestive or descriptive.

[2] This court takes no position on whether abandonment can occur when the allegedly infringing act occurs before the senior user leaves the market.

court observed the pending counterclaim but did not evaluate it, raising the possibility that this appeal is premature. But in granting summary judgment, the district court concluded its order by stating "Civil case terminated." When a district court says that it is finished with a case and "enter[s] a judgment terminating it," as the judge did here, the order is final and appealable, even if the court left part of the case untouched. *Chase Manhattan Mortg. Corp. v. Moore,* 446 F.3d 725, 727 (7th Cir. 2006). So our jurisdiction is secure.

We move on to the merits. To survive summary judgment, Baig was required to present evidence from which a reasonable jury could find that he had a protectable mark. *See H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 759 (7th Cir. 2007); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014). Because the mark is unregistered, Baig bears the burden of establishing that the mark is entitled to protection. *Platinum Home Mortg. Corp. v. Platinum Fin. Grp. Inc.,* 149 F.3d 722, 727 (7th Cir. 1998). Marks that are merely "descriptive" of a product's features do not distinguish the product from others in its market and thus are not protectable unless the owner demonstrates that the mark has acquired "secondary meaning." *See H-D Mich.*, 496 F.3d at 759; *StonCor Grp., Inc. v. Specialty Coatings, Inc.*, 759 F.3d 1327, 1332 (Fed. Cir. 2014). A descriptive mark with a secondary meaning is a mark that has become "uniquely associated" with a single source. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 n.4, 769 (1992); *H-D Mich.*, 496 F.3d at 759–60.

Baig does not challenge the district court's determination that "Naturally Zero" is descriptive; he contests only its ruling that the phrase developed no secondary meaning. He argues that we should presume that his mark has acquired secondary meaning because he used it for more than five years. He relies on 15 U.S.C. § 1052(f), which allows the Patent and Trademark Office to presume that a mark has acquired distinctiveness after proof of five years of "substantially exclusive and continuous use." But this presumption applies only to applications to register a mark, not to suits to establish liability for infringement, and it is merely a permissive presumption even in that context. *See* U.S. DEPT. OF COMMERCE, PATENT AND TRADEMARK OFFICE, TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1212 (4th ed. Oct. 2014) ("Depending on the nature of the mark and the facts in the record, the examining attorney may determine that . . . a claim of five years' substantially exclusive and continuous use in commerce is insufficient to establish a prima facie case of acquired distinctiveness."); *see also* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:62 (4th ed. 2003). In trademark-infringement suits, instead of presuming secondary meaning from just the length and manner of use, courts consider several other factors: the exclusivity of use,

amount and manner of advertising, volume of sales, number of customers, whether the product occupies an established place in the market, proof of intentional copying, and consumer testimony and surveys. *Platinum Home Mortg. Corp.*, 149 F.3d at 728; *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989); *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999).

Considering all these factors, we conclude that Baig has not provided evidence from which a rational jury could determine "Naturally Zero" had established secondary meaning. First the factors related to market activity all disfavor Baig. Blue Springs was a tiny and brief entrant with negligible sales in the bottled-water portion of the beverage industry; its trivial role made it "difficult, maybe impossible," for it to develop secondary meaning in the beverage industry for its mark. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 484 (7th Cir. 2007). Moreover Baig's narrow advertising efforts—limited to trade publications, which are primarily read by industry insiders, and some pamphlets handed out at gas stations—are also insufficient to show that a substantial segment of *consumers* associated "Naturally Zero" with a single source. *See Echo Travel*, 870 F.2d at 1270 (describing 25,000 posters and ads in student newspapers as insufficient to show secondary meaning); *In re Pennzoil Prods. Co.*, 20 U.S.P.Q.2d 1753, *7 (P.T.O. Aug. 21, 1991) (explaining that even substantial advertising efforts are insufficient to show secondary meaning when expenditures are "not determinative of the success of those efforts"). And Baig's relatively insignificant and intermittent sales from 1998 to 2004 are insufficient for a finding that a *substantial* number of consumers would consider "Naturally Zero" to be uniquely associated with Baig's brand. *See Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 907 (7th Cir. 1983) (describing five years' use as "so brief as to cast serious doubt upon the very possibility of having established a strong secondary meaning"); *see also Vais Arms, Inc. v. Vais*, 383 F.3d 287, 291 n.6 (5th Cir. 2004); *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990).

The remaining factors—copying and consumer reaction—also do not favor Baig. True, Baig has evidence that Coca-Cola possessed some of Baig's marketing materials before Diet Sprite Zero was released in the United States. But even if this evidence permitted an inference that Coca-Cola used those materials, "[c]opying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's," *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995); *see* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:38 (4th ed. 2003), and Baig does not argue that this was Coca-Cola's intent. In addition Baig did not present any testimony or surveys showing that

consumers associated "Naturally Zero" with one source; though not fatal by itself, the absence of this evidence further weighs against his claim. *See Platinum Home Mortg. Corp.*, 149 F.3d at 728. Thus with no factor favoring Baig, we agree with the district court that Baig did not present sufficient evidence of secondary meaning to defeat Coca-Cola's motion for summary judgment.

AFFIRMED.