PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-2335

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff – Appellant,

v.

MCLEOD HEALTH, INC.,

Defendant – Appellee.

Appeal from the United States District Court for the District of South Carolina, at Florence. Bruce H. Hendricks, District Judge.  (4:14-cv-03615-BHH)

Argued:  November 15, 2018                    Decided:  January 31, 2019

Before GREGORY, Chief Judge, and KEENAN and FLOYD, Circuit Judges.

Reversed and remanded by published opinion. Judge Floyd wrote the opinion, in which Chief Judge Gregory and Judge Keenan concurred.

**ARGUED:**  Jeremy Daniel Horowitz, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant.  Michael Montgomery Shetterly, I, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Greenville, South Carolina, for Appellee.  **ON BRIEF:**  James L. Lee, Deputy General Counsel, Jennifer S. Goldstein, Associate General Counsel, Elizabeth E. Theran, Assistant General Counsel, Office of General Counsel, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. Lucas J. Asper, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Greenville, South Carolina, for Appellee.

FLOYD, Circuit Judge:

The Equal Employment Opportunity Commission (EEOC) brought suit against McLeod Health, Inc. for alleged violations of the Americans with Disabilities Act (ADA). The EEOC claimed that McLeod violated the ADA by requiring Cecilia Whitten, a longtime employee with a disability, to undergo a work-related medical exam. Additionally, the EEOC claimed that McLeod violated the ADA by wrongfully discharging Whitten on the basis of her disability. The district court granted summary judgment to McLeod on both claims, and the EEOC now appeals. For the reasons that follow, we reverse the district court and remand for further proceedings.

I.

For 28 years, Whitten worked for McLeod, a corporation that operates various hospitals and other healthcare facilities in South Carolina.[1] She was, in essence, the editor of McLeod's internal employee newsletter. One of her responsibilities was to develop content for the newsletter by interviewing other employees and writing about company events. To that end, Whitten typically traveled among McLeod's various campuses. Although it was not always so, McLeod now has five different campuses, spread throughout an area of roughly 100 miles.

Whitten was born with a physical disability known as "postaxial hypoplasia of the

---

[1] Because this is an appeal from a grant of summary judgment, we recount the facts in the light most favorable to the non-movant—i.e., the EEOC. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015).

lower extremity." J.A. 284. Consequently, she lacks certain bones in her legs, feet, and right hand. J.A. 282. Her lower legs are, in her words, "shorter than normal," and her "right arm is shorter than [her] left arm." *Id.*

As a result of her disability, Whitten has always struggled with mobility. "Falling," she testified, "has been part of my life all my life and there's no way around it." J.A. 317. Although she has had several surgeries to increase her stability, her limited "use of [her] feet and legs" still causes her to "fall sometimes" and "stumble sometimes." J.A. 287. Additionally, her condition causes her to "get . . .tired more easily" and makes it difficult for her to sit or stand "in one position for too long." J.A. 287–88.

Despite her limited mobility, Whitten satisfactorily performed her duties as editor of McLeod's employee newsletter for almost three decades. In McLeod's words, Whitten's condition "has not impacted her ability to perform the essential functions of her job during her employment." J.A. 142. Records indicate that Whitten fell at work multiple times before the events that precipitated this appeal.

Over the course of several months preceding the events at issue here, Whitten's manager, Jumana Swindler, repeatedly expressed concerns about Whitten's performance to McLeod's human resources department (HR). Swindler told HR that Whitten had been missing deadlines, arriving late to work, and, in Swindler's view, displaying a less-than-enthusiastic attitude about McLeod's internal messaging. In her discussions with HR, Swindler raised the possibility that Whitten's performance issues were due to problems with her health. Swindler thought that Whitten looked "sluggish," as if walking was more difficult for her than usual. J.A. 390. According to Swindler, Whitten appeared flushed

2

and winded after moving very short distances; she also seemed to have trouble staying alert during meetings.

At HR's suggestion, Swindler attempted to address Whitten's performance issues by meeting with Whitten, clarifying her expectations, and reducing Whitten's workload. She did not raise any concerns about Whitten's health with Whitten herself.

In 2012, Whitten fell three times in a four-month span. The first fall occurred outside of work: Whitten tripped over a root while walking through the park and landed on a tree stump. She needed stitches in her forehead, but suffered no other harm. The second fall occurred at work: she tripped on a rug and experienced no significant harm. The third fall occurred outside of work: she tripped as she was leaving a restaurant after lunch with a friend. She had her arm x-rayed that afternoon; the bone was bruised, but it was not broken, and she was back at work the next day.

Swindler reported Whitten's third fall to HR shortly after it happened. HR advised Swindler to bring her concerns to the company's occupational health department (hereinafter "Occupational Health"). Swindler did so right away. Based on Swindler's report, Whitten's job description, and its own records of Whitten's medical issues, Occupational Health determined that Whitten needed to undergo a fitness-for-duty medical exam. Notably, Occupational Health was not particularly concerned with Whitten's performance on the job. It ordered the fitness-for-duty exam to ensure that Whitten could "safely get to different locations to do her stories." J.A. 60.

The day after Whitten's third fall, Swindler informed Whitten "that she was going to take [her] to [Occupational Health]." J.A. 717. Swindler explained that "since [Whitten]

3

had had several falls, they wanted to examine [her] work space and make sure it was safe for [her]." *Id.* Whitten "was confused about the necessity" of the exam, "especially since only one of the falls had been at work," but she "didn't feel that [she] had a choice but to comply." *Id.* She told Swindler, "That would be nice." J.A. 43.

At Occupational Health, a nurse practitioner gave Whitten a fitness-for-duty exam. During the exam, Whitten told the nurse practitioner about her medical history and the circumstances of her recent falls. Whitten also told the nurse practitioner that she had difficulty stepping onto curbs and that she was supposed to—but generally did not—use a cane at work. The nurse practitioner listened to Whitten's heart and lungs; she also examined Whitten's joints.

The nurse practitioner concluded that Whitten needed further testing—specifically, a functional-capacity exam. A functional-capacity exam is an exam in which a physician evaluates whether an employee is physically capable of performing the duties of her job. The nurse practitioner based her conclusion that further examination was necessary on three things: (1) Whitten's self-reported history of falls; (2) her decision not to use her recommended assistive device; and (3) "her general lack of mobility and range of motion in her knees, ankles, and feet." J.A. 771.

McLeod placed Whitten on paid administrative leave pending the results of her functional-capacity exam. Two weeks later, Whitten underwent a functional-capacity exam with an occupational therapist named Todd Laliberte, an occupational therapist. Laliberte acknowledged that he did not have access to Whitten to clarify her job duties prior to the exam. Moreover, although McLeod informed Laliberte that Whitten's work

4

required her to carry no more than 20 pounds at a time, Laliberte determined that Whitten would likely need to be able to carry 38 pounds at a time to do her job, and he tested her accordingly. Notes from his exam indicate that he believed that Whitten had only "recently beg[u]n to fall at work and in her home." J.A. 934.

Laliberte concluded that Whitten had a "[h]igh fall risk" in "75% of all work related task[s]."[2] J.A. 840. He recommended that Whitten, among other things, (1) be restricted to traveling no more than 10 miles from her main office; (2) use an assistive device, such as a motorized scooter; and (3) be provided a parking space in an area without a curb.

Whitten, in turn, submitted a request for the following accommodations: (1) a parking spot in an area without a curb, (2) help with selecting an appropriate assistive device, (3) a new desk chair with adjustable-height arms, and (4) limitations on walking and standing "as much as possible." J.A. 737. She did not believe that she needed any accommodations to continue doing her job, but she thought that she was required to submit the accommodation form.

After reviewing Laliberte's conclusions and Whitten's request, McLeod informed Whitten that she could not return to her job because her proposed accommodations would prevent her from traveling to the company's various campuses to collect stories and take photographs, thereby nullifying the purpose of her position. Accordingly, the company

---

[2] His explanation of that conclusion was—for lack of a better term—befuddling. When asked how he arrived at Whitten's 75% fall risk, he answered (paraphrasing Whitten's self-report): "[She's] fallen at home. [She's] fallen at restaurants, and [she's] fallen at work. One, two, three. 75 percent." J.A. 822 (internal quotation marks removed).

5

placed Whitten on unpaid medical leave. Although she was told several times that she could submit reports from her own doctors if she disagreed with Laliberte's conclusions, she was also told at least once that she could not have her old job back.

Whitten did not submit reports from her own doctors to refute Laliberte's conclusions. Nor did she apply for other jobs available within McLeod, even though the company assigned her a recruiter to help her find suitable open positions. (Whitten found some open positions for which she was marginally qualified, but they paid significantly less than what she had made in her old job.)

After Whitten had been on medical leave for six months, McLeod terminated her employment. Whitten filed a complaint with the EEOC, and the EEOC brought suit against McLeod for violating the ADA by (1) requiring Whitten to undergo a medical exam despite a lack of objective evidence that such an exam was necessary (the "illegal-exam claim"), and (2) discharging Whitten on the basis of her disability (the "wrongful-discharge claim"). *See* 42 U.S.C. §§ 12112(a), 12112(d)(4)(A). The district court granted summary judgment to McLeod on both claims, and the EEOC timely appealed.

II.

We review the district court's grant of summary judgment de novo. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 565 n.1 (4th Cir. 2015). In doing so, we regard the evidence in the light most favorable to the non-moving party. *Id.* Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material

6

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, if the evidence would permit a jury to find in the non-movant's favor on a disputed question of material fact, summary judgment is inappropriate. *Jacobs*, 780 F.3d at 568.

## III.

### A.

We begin with the EEOC's claim that McLeod violated the ADA by requiring Whitten to undergo a medical exam to ensure that she could still safely navigate to and within its campuses.[3] The ADA prohibits covered employers from requiring an employee to undergo a medical exam "unless such examination . . . is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The EEOC's enforcement guidelines state that for an employer-ordered medical exam to be job-related and consistent with business necessity, the employer must reasonably believe, based on objective evidence, that either (a) the employee's ability to perform an essential job function is impaired by a medical condition, or (b) the employee can perform all the essential functions of the job, but because of his or her medical condition, doing so will pose a "direct threat"

---

[3] The EEOC views Whitten's examination by Occupational Health and her subsequent examination by Laliberte as two separate medical exams. In contrast, the district court treated Whitten's examinations by Occupational Health and Laliberte as phases of a single overarching exam. We too refer throughout this opinion to a single two-phase medical exam. This is a stylistic choice and has no impact on our analysis. We express no opinion on whether, in substance, Whitten was actually subject to two separate exams or a single exam with two phases.

7

to his or her own safety or the safety of others.[4]  ENFORCEMENT GUIDANCE: DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES UNDER THE AMERICANS WITH DISABILITIES ACT (ADA), 2000 WL 33407181, at *6.[5]  McLeod argues that it did not violate the ADA by requiring Whitten to undergo a work-related medical exam because it reasonably believed, based on objective evidence, that Whitten could not navigate to or within its medical campuses without posing a direct threat to herself.[6]

The threshold question here is whether navigating to and within McLeod's campuses was an essential function of Whitten's job.  McLeod says it was; the EEOC says it was not.

_____

[4] A "direct threat" is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r).  We do not address the "or others" portion of this definition because McLeod has not argued—and there is no evidence—that Whitten's medical condition caused her to perform the essential functions of her job in a manner that posed a direct threat to others.

[5] The district court applied the EEOC's enforcement guidance, and neither party challenges its decision to do so.  We note that although the EEOC's enforcement guidance is not binding, other courts of appeals have chosen to apply it when addressing the type of claim at issue here.  *See, e.g.*, *Wright v. Illinois Dep't of Children & Family Servs.,* 798 F.3d 513, 522–24 (7th Cir. 2015); *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1313 (11th Cir. 2013).  Similarly, this Court has turned to the EEOC's enforcement guidance when analyzing other types of claims under the ADA.  *E.g.*, *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997).  Accordingly, we think it appropriate in this case to use the EEOC's enforcement guidance as a framework for analyzing the parties' arguments.

[6] According to McLeod, one of the essential functions of Whitten's job was to *safely* navigate to and within the company's campuses.  The district court adopted that framing, but we do not, because we think that adding the qualifier "safely" to the job function at issue muddles the analysis.  The correct way to apply the EEOC's enforcement guidance in a case like this is to begin by asking: does the relevant job function (here, navigating to and within McLeod's campuses) qualify as essential?  If the answer is yes, we *then* ask whether the employee is medically capable of performing the function without posing a direct threat to herself or others—i.e., whether the employee can perform the function safely.

This question has the potential to be dispositive: if a jury were to side with the EEOC, then the EEOC would necessarily prevail on its illegal-exam claim. But the district court, in granting summary judgment to McLeod, held that there was no need to send the question to the jury. According to the district court, the EEOC did not produce enough evidence for a reasonable jury to come down on its side. We disagree.

There is no doubt that the record contains evidence supporting McLeod's position. For instance, Swindler testified that Whitten's job required her to navigate to and from company events and conduct in-person interviews. Additionally, Whitten agreed in deposition testimony that her job "require[d] the ability to safely navigate marketing department functions to include, but not limited to, outside in parking lots, grassy areas and walking in a wide variety of areas in order to obtain photographs and interviews." J.A. 637.

On the other hand, the record also contains evidence supporting the EEOC's position: that although Whitten preferred to navigate McLeod's various campuses to conduct in-person interviews, take photographs, and attend company events, doing so was not actually essential to her job. For instance, McLeod's own written description of Whitten's position contains no mention of navigating to and from company events or conducting in-person interviews. Additionally, Whitten testified that although she collected better content by attending company events and conducting in-person interviews, she did not think that either was "necessarily" a requirement of her job. J.A. 310. And the EEOC produced evidence that Whitten was able to conduct interviews and collect other forms of content over the phone.

Our job at this stage is not to decide which party's evidence is stronger or more persuasive. It is only to determine whether the EEOC has produced more than "a mere scintilla of evidence" in support of its position that navigating to and within McLeod's campuses was not an essential function of Whitten's job. *Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018) (internal quotation marks omitted). We conclude that it has. Accordingly, the question is one for the jury, and McLeod is not entitled to summary judgment on the EEOC's illegal-exam claim.

We note that even if it were beyond dispute that navigating to and within McLeod's campuses was an essential function of Whitten's job, we would still hold that McLeod is not entitled to summary judgment. A reasonable jury could conclude that when McLeod required Whitten to take a medical exam, the company lacked a reasonable belief—based on objective evidence—that Whitten's medical condition had left her unable to navigate to and within the company's campuses without posing a direct threat to her own safety. This, too, makes summary judgment inappropriate.

To explain, we begin by considering what McLeod knew *before* it required Whitten to undergo a medical exam. ENFORCEMENT GUIDANCE, 2000 WL 33407181, at \*7 ("An employer's reasonable belief" that an employee, due to a medical condition, cannot perform an essential job function or cannot do so without posing a direct threat, "must be based on *objective evidence* obtained, or reasonably available to the employer, *prior to* making a disability-related inquiry or requiring a medical examination." (second emphasis supplied)). At the relevant point in time, McLeod knew that: (1) Whitten had been able to perform the essential functions of her job—including traveling to and within McLeod's

various medical campuses to collect stories—for 28 years, even though she suffered from limited mobility and sometimes fell at work. (2) In the preceding four months, Whitten had fallen once at work and twice outside of work. The fall at work caused virtually no injury, and the falls outside of work did not cause severe injuries. (3) Whitten had recently missed deadlines, shown up late, and struggled to handle her workload. (4) Whitten's manager thought that Whitten looked unusually winded after walking short distances and that she appeared groggy during meetings.

Given that information, the question is: could a reasonable jury conclude that it was unreasonable for McLeod to believe—based on the objective evidence available to it at the time—that Whitten was medically unable to navigate its campuses without posing a direct threat to her own safety? We believe the answer is yes. Specifically, a reasonable jury, viewing the evidence in the light most favorable to Whitten, could conclude that in the context of Whitten's employment history, it was not reasonable for McLeod to believe that she had become a direct threat to herself on the job simply because (a) she had fallen multiple times recently and (b) her manager thought she looked groggy and out of breath. This is especially so given that the only one of Whitten's recent falls to occur at work resulted in virtually no injury.

In sum, McLeod is not entitled to summary judgment on the EEOC's illegal-exam claim, and therefore, we reverse.[7]

---

[7] Because our analysis thus far gives us ample reason to reverse, we do not reach an additional argument raised in the EEOC's briefs: that summary judgment for McLeod was inappropriate because a reasonable jury could find that Laliberte's functional-capacity-

11

B.

The EEOC also claims that McLeod violated the ADA by discharging Whitten on the basis of her disability. On this claim, too, the district court granted summary judgment to McLeod. Again, we disagree.

When bringing a wrongful-discharge claim under the ADA, "a plaintiff must prove (1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." *Jacobs*, 780 F.3d at 572 (quoting *EEOC v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373, 377 (4th Cir. 2000) (alteration in source)).

No one doubts that the first element is satisfied. The second element—whether Whitten was a qualified individual when she was removed from her position—is the crux of the issue on appeal. A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In relevant part, the district court determined that McLeod was entitled to summary judgment because the EEOC could not prove that Whitten was qualified to carry on her work with the company's internal newsletter.

The district court's reasoning was premised on its analysis of the EEOC's illegal-exam claim. In essence, the district court reasoned that the EEOC could not prove that Whitten

---

exam was insufficiently tailored to Whitten's actual job requirements and therefore inconsistent with business necessity.

12

was qualified for her job at the time she was fired because navigating to and within McLeod's campuses was an essential function of the job, and Whitten's medical exam—particularly Laliberte's report—indicated that no reasonable accommodation would permit her to perform that function without posing a direct threat to her own safety. McLeod asks us to affirm on the same basis.

As we have already discussed, it is not certain that navigating to and within McLeod's campuses was essential to Whitten's job. By the same token, it is not certain that Whitten's medical exam was lawful. Since the district court's grant of summary judgment assumed that those points were not in dispute, we cannot affirm on the basis of the district court's reasoning. McLeod has provided us with no alternative basis on which to affirm. Accordingly, we conclude that McLeod is not entitled to summary judgment on the EEOC's wrongful-discharge claim.

IV.

For the foregoing reasons, we reverse the district court's order granting summary judgment to McLeod and remand for further proceedings.

REVERSED AND REMANDED

13