In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3107

KIMBERLY BILINSKY,

*Plaintiff-Appellant,*

*v.*

AMERICAN AIRLINES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 4253 — **Virginia M. Kendall**, *Judge*.

ARGUED MARCH 27, 2019 — DECIDED JUNE 26, 2019

Before EASTERBROOK, KANNE, and HAMILTON, *Circuit Judges*.

KANNE, *Circuit Judge*. American Airlines employed Kimberly Bilinsky for more than two decades. That employment continued without issue after Bilinsky contracted multiple sclerosis ("MS") in the late 1990s. American provided a "Work from Home Arrangement" ("WFHA"), which permitted Bilinsky to do her job from her home in Chicago, even though her colleagues operated out of the company headquarters in

Dallas. But after a 2013 merger, American restructured its op-
erations and informally repurposed Bilinsky's department.
The executives determined that the new duties required the
in-person involvement of the employees, so the company re-
scinded the arrangement and demanded that Bilinsky relo-
cate to Texas to work face-to-face. Once negotiations col-
lapsed, American terminated Bilinsky.

This lawsuit under the Americans with Disabilities Act
("ADA") followed. 42 U.S.C. § 12111 *et seq.* The district court
granted summary judgment to American, finding that Bilin-
sky was no longer qualified for the position in light of the
changes in her responsibilities. Because Bilinsky's evidence
does not counter that assertion, we affirm.

## I. BACKGROUND

American hired Bilinsky in 1991. She served in several po-
sitions, taking on a role in 2007 as a communications specialist
in the Flight Service Department, located in Dallas at the com-
pany's headquarters. But according to Bilinsky's medical rec-
ords, excessive heat aggravates her MS symptoms and causes
her discomfort and reduced functioning. Under the WFHA,
American permitted Bilinsky to work from Chicago, where
hot weather is less of a concern. She usually traveled to Dallas
one day per week to meet with colleagues and perform tasks
that required a physical presence.

Bilinsky's duties included participating in conference
calls, administering an internal website used to distribute in-
formation to flight attendants, publishing articles intended for
consumption by flight attendants, producing e-mail commu-
nications to employees, and preparing remarks for her boss's
weekly internal video announcement. The position had no

formal, written job description. Bilinsky performed success-
fully for several years, and there is no record of complaints or
disciplinary action against her.

American merged with US Airways in 2013. The resulting
company (still American Airlines) had to integrate the opera-
tions of both airlines into a single entity with common policies
and procedures. Hector Adler, the Flight Service Depart-
ment's Vice President at that time, testified that "[i]t was a
very extensive and significant task that involved nearly every
person in the department." As the process dragged on, Adler
felt that existing work arrangements were insufficient to meet
the demand. The department expanded its workload, transi-
tioning from primarily producing written communications to
putting on live events and performing crisis management
functions. The additional work caused the Dallas employees
to feel "spread very thin at times."

Under the circumstances, Adler unilaterally decided to re-
quire all employees to be physically present at headquarters.
This decision affected two employees other than Bilinsky: one
relocated to Dallas, but the other refused and was terminated.
Upon learning of the impending changes, Bilinsky spoke with
her immediate supervisor, Cathy Scheu, on May 20, 2014.
Bilinsky emphasized that her WFHA was a necessary accom-
modation for her disability and that relocating to Dallas was
not an option. Scheu communicated the information to Adler,
but Adler indicated his intent to deny the request.

Later that year, Scheu and Human Resources representa-
tive Rhonda Nicol-Perrin approached Bilinsky to determine
whether the company could make alternative accommoda-
tions that would permit Bilinsky to relocate. Bilinsky re-
sponded that the company would need to provide "a tube of

air conditioning around [her] at all times." She stressed that working at American's Dallas office was not a problem, but living in a hot part of the country year-round and trying to engage in activities outside the office would create a concern.

Scheu and Nicol-Perrin then looked for other positions for Bilinsky. They identified a few jobs in Chicago, but Bilinsky was either not qualified for them or not interested in them. Bilinsky separately applied for a technical writer job in the Flight Service Department. That job was also located in Dallas, but the incumbent had worked remotely. Although the interviewer indicated that she wanted to hire Bilinsky for the position, the company declined to allow Bilinsky to work remotely in the new capacity. The position was vacant precisely because the incumbent had been working from home and was affected by the same policy shift that affected Bilinsky.

Throughout 2014 and early 2015, Bilinsky continued to work as before. Linda Carlson took over as Bilinsky's immediate supervisor after Scheu was promoted. Carlson expressed no complaints about Bilinsky's performance. The issue came to a head in February 2015, when the department helped to produce the American Airlines Leadership Conference in Dallas. Bilinsky was not asked to attend the event or assist with preparations, but Carlson otherwise called upon "anybody who was a warm body" to help with the event. Carlson acknowledged that "if you asked [Bilinsky] to pick up the slack or to do a project, she was always willing." But she immediately qualified that statement: "She just wasn't able to do things that you needed to do to support an event. You can't drive to the hotel that's in Dallas if you're in Chicago." One month after the conference, Scheu and Nicol-Perrin informed Bilinsky that she would need to complete her

relocation or leave her job. On May 1, 2015, American terminated Bilinsky's employment.

Bilinsky filed a complaint with the Equal Employment Opportunity Commission and received a "right to sue" letter. She then filed this suit in the federal district court in Chicago. Her complaint alleged three counts: (I) that American failed to accommodate her disability under the ADA; (II) that American retaliated against her for insisting on an accommodation by denying her the technical writer position; and (III) that American failed to accommodate her disability under the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5 § 1-102 *et seq*. After discovery, the district court granted summary judgment to American on all three counts, finding that Bilinsky was not a "qualified individual" for the position in light of the changes in her responsibilities, and was therefore ineligible for the ADA's protection. Bilinsky appealed the award of summary judgment on counts I and III.

## II. ANALYSIS

We review summary judgment *de novo*, considering the evidence in the light most favorable to Bilinsky and drawing all reasonable inferences in her favor. *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 192 (7th Cir. 2011). Illinois courts "have looked to the standards applicable to analogous federal claims" when evaluating IHRA claims, so we consolidate our analysis of both counts. *Sangamon Cty. Sheriff's Dep't v. Ill. Human Rights Comm'n*, 908 N.E.2d 39, 50 (Ill. 2009); *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013).

Bilinsky believes the district court erred in finding that she was not a "qualified individual" under the statute and therefore not entitled to protection. The ADA prohibits a covered

employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to … the … discharge of employees … ." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical … limitations of an otherwise qualified individual with a disability who is an … employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." *Id.* § 12112(b)(5)(A). A "qualified individual" is one who "can perform the essential functions of the employment position." *Id.* § 12111(8). The statute directs that courts shall give "consideration … to the employer's judgment as to what functions of a job are essential." *Id.*

The EEOC issues regulations interpreting the ADA, but its "interpretation is not necessarily entitled to any special deference by the courts, because Congress has not given that agency the authority to interpret the ADA." *Winsley v. Cook Cty.*, 563 F.3d 598, 603 n.2 (7th Cir. 2009). We consider those regulations solely as persuasive authority. The EEOC has defined "essential functions" as "the fundamental job duties of the employment position"; they do not include "marginal functions." 29 C.F.R. § 1630.2(n)(1). In interpretive guidance, the EEOC has noted that, when assessing the essential functions of a job, "the inquiry will then center around whether removing the function would fundamentally alter that position." *Id.* § 1630 App. "To determine whether a job function is essential, we look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)). We also consider "[t]he

consequences of not requiring the incumbent to perform the function." *Miller*, 643 F.3d at 198.

The district court's judgment rested on its conclusion that Bilinsky was not a "qualified individual" under the ADA. "[A] worker has no claim under the ADA if she, even with a reasonable accommodation, cannot do the job for which she was hired." *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998) (citing *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997)). Although the EEOC regulations point us to several factors to consider when defining a job's essential functions, *see* 29 C.F.R. § 1630.2(n)(3), the statute lists only two: "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description … for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). We've previously emphasized the statutory factors over those contained in the regulations. "Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *DePaoli*, 140 F.3d at 674 (citations omitted). But we've also cautioned that although "the employer's judgment is an important factor, … it is not controlling." *Miller*, 643 F.3d at 198. "The ADA does not give employers unfettered discretion to decide what is reasonable." *Id.* at 199.

"The essential-function inquiry is a factual question, *not* a question of law." *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016). The plaintiff "bears the initial burden of establishing that she was a qualified individual who could perform the

essential functions of her position." *Taylor-Navotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014). Both parties agree that Bilinsky's MS is a qualifying disability under the statute, and American concedes that Bilinsky was qualified to do the job with her accommodation prior to the 2013 merger. But it argues that the merger fundamentally changed the position's nature and that consistent, physical presence on site became an essential function of the position at some point after 2013. Because Bilinsky could not perform that function from her home in Chicago, and because she was unable to relocate to establish a physical presence, American contends that she was not qualified for the transformed position.

In *Miller*, a highway worker suffered a panic attack while working on a bridge suspended high above a river. 643 F.3d at 193. Diagnosed with acrophobia, he requested an accommodation that he not be assigned to any jobs requiring him to work more than 25 feet in the air. *Id.* The employer determined that such work was an essential function of his job and terminated him. *Id.* at 193–94. The district court agreed and granted summary judgment. But we reversed, believing that there was a genuine dispute of material fact over whether such work was truly essential to Miller's job. Applying the EEOC regulations, we thought it important to "look to evidence of the employer's actual practices in the workplace." *Id.* at 198. Because the bridge crew had a history of divvying up tasks to crew members based on their "individual abilities, preferences, and limitations," "Miller's request for reasonable accommodation did not ask [the employer] to do anything it was not already doing." *Id.* at 200. There was a genuine dispute over whether conducting work high in the air was essential, and it should have been left to a jury to resolve.

But we came to the opposite conclusion in *Taylor-Navotny*. There, an employee's MS symptoms kept her from maintaining a regular schedule. 772 F.3d at 483. She came into the office at varied hours and could not plan her schedule in advance. *Id.* She requested a work-from-home arrangement, but even then, she failed to sign online at regular hours or attend meetings by phone consistently. *Id.* at 486–87. The employer let her go, and the district court granted summary judgment to the employer because Taylor-Navotny could not perform the job's essential functions, such as regular attendance. We affirmed. Although we had sometimes observed that regular attendance and punctuality are not essential functions of every job, we stressed that "an employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance." *Id.* at 489 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013)). Working from home was not the issue; instead, wherever the employee might be, she needed to be available and participating during normal working hours. *Id.* at 490. We affirmed summary judgment. *Id.*

This case falls somewhere between those two poles. Bilinsky makes the same claim as the plaintiff in *Miller*: she was able to do the job successfully for years, and her termination resulted merely from a change in her boss's preferences about working arrangements that did not accurately state the position's essential functions. Although American acknowledges that Bilinsky was once able to perform the essential functions with a reasonable accommodation prior to the 2013 merger, it contends that those functions changed upon restructuring. The nature of her team's work evolved from independent activities (curating content on a website, responding to written questions from employees, etc.) to team-centered crisis

management activities, involving frequent face-to-face meetings with team members on short notice to coordinate work.

Those facts distinguish this case from *Miller*. There, the highway construction crew's work continued as it had before; there were no changes in their duties due to intervening events. The plaintiff's medical condition was the only factor that changed over time. We reversed a grant of summary judgment because the plaintiff produced evidence showing that his request for an accommodation "did not ask [his employer] to do anything it was not already doing." 643 F.3d at 200. The accommodation he requested was already something that occurred in "the normal course" of the crew's duties. *Id. See also EEOC v. McLeod Health, Inc.*, 914 F.3d 876 (4th Cir. 2019) (reversing summary judgment for employer where there was no evidence of a change in the plaintiff's job duties, but only a possible deterioration in her medical condition).

Bilinsky faces a different problem: evidence of a change in job responsibilities for everyone in her department. The district court determined that "[d]eference to American's judgment as the employer is required in the absence of an adequate factual legal basis to abandon that deference." *Bilinsky v. Am. Airlines, Inc.*, No. 16-c-4253, 2018 WL 4181481 at *7 (N.D. Ill. Aug. 31, 2018) (citing *Gratzl v. Office of Chief Judges*, 601 F.3d 674, 679 (7th Cir. 2010); *DePaoli*, 140 F.3d at 674). American produced testimony from several employees stating that the nature of the work slowly evolved after the merger and changed the essential functions of Bilinsky's job. Those employees included Adler (VP of Flight Service), Scheu (Bilinsky's first supervisor), and Carlson (Bilinsky's subsequent supervisor). They all uniformly testified about the unique stress the merger caused, the changing day-to-day

responsibilities of employees in the department, and the increased demand for services that only local employees could provide. Those with personal knowledge of Bilinsky's circumstances testified that she performed as well as she could given her accommodation, but that there remained a gap that Bilinsky (and the other remote employees) could not fill.

To counter American's assertions, Bilinsky points primarily to her experience in the position prior to the merger, as well as her continued success after the merger occurred. Those are important considerations in the EEOC's list of factors, but as the district court correctly noted, Bilinsky's success prior to the merger does not address whether the essential functions of her job changed some time after the merger.

Similarly, while evidence that Bilinsky performed successfully post-merger would be probative of her qualification for the updated position, testimony from her co-workers did not support that proposition. Bilinsky's best evidence is testimony from Linda Carlson, her manager after Cathy Scheu departed in late 2014. Carlson testified that Bilinsky willingly agreed to take on extra work for other employees when live events were taking place and they could not be at their desks: "If you asked Kimberly to pick up the slack or to do a project, she was always willing. I don't recall her ever not being willing to help or pick up slack." But in the same breath Carlson gave testimony that undermines Bilinsky's case: "[Bilinsky] just wasn't able to do things that you needed to do to support an event. You can't drive to the hotel that's in Dallas if you're in Chicago. You can't go check out [AV] equipment in Chicago. You can't meet with subject matter experts to directly, you know, get photographs." "[Other employees] would be frustrated they didn't have another set of hands to divide and

conquer work that had to be done there. … And I[,] like the team[,] felt spread very thin at times." The testimony establishes Bilinsky's willingness to perform, but it does not create a genuine dispute over her ability to fill the gap.

At best, Bilinsky's evidence shows that the job responsibilities evolved slowly. That partially distinguishes this case from *Gratzl*. There, a court reporter suffered from incontinence and required frequent, unplanned bathroom breaks. 601 F.3d at 676–77. That made her ill-suited to working in a courtroom, so she worked in a central control room in a specialist position. *Id.* at 677. But the state later eliminated the specialist position and put all court reporters in the same job category. *Id.* The county's chief judge determined that all court reporters would henceforth participate in a rotation through all courtrooms, an arrangement that did not accommodate Gratzl's needs. *Id.* After negotiations broke down, Gratzl sued. *Id.* at 678. The district court granted summary judgment to the employer, and we affirmed. We determined that Gratzl could not "prove that she [was] qualified for her current job simply by citing evidence that she was qualified for a previous job, with different essential functions, that ha[d] been eliminated." *Id.* at 680.

Bilinsky's case is not quite so black-and-white, as American never eliminated her position and did not have a written job description that it updated to reflect new circumstances. But the fact that American transitioned the department to new responsibilities slowly rather than all at once does not mean that the job's essential functions didn't change at some point after the merger. To that extent, the rule in *Gratzl* applies equally to this case: "Just as an employer is not required to create a new position or strip a current job of its essential

functions [under the ADA], an employer is not required to maintain an existing position or structure that, for legitimate reasons, it no longer believes is appropriate." *Id*.

Bilinsky's remaining challenges focus on the sufficiency of American's evidence. But at the summary judgment stage, the district court's job was not to weigh the evidence but merely to determine whether there was a genuine dispute of fact.[1] American's witnesses specifically identified only one major event for which Bilinsky was absent: the 2015 Leadership Conference. Bilinsky argues that a single event is not enough to establish a pattern, but she offered no countervailing evidence to show that the conference was an isolated event rather than one example of a regular occurrence.

We stress that our holding today is confined to the unique facts of this case. The ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The statute "does not give employers unfettered discretion to decide what is reasonable." *Miller*, 643 F.3d at 199. Absent some change in circumstance, an employer may not rescind an accommodation simply because it is inconvenient or burdensome—the statute requires the employer to make reasonable sacrifices to keep disabled persons

---

[1] The district court did briefly discuss weighing the evidence between the two parties. *See Bilinsky*, 2018 WL 4181481 at *6 ("But these facts do not sufficiently *outweigh* American's judgment and so Bilinsky does not provide the Court with an adequate factual dispute.") (emphasis added). But the court seems to have used the term while determining whether Bilinsky had enough evidence to overcome the presumption that an employer's understanding of the essential factors of a job is correct. *See Basith v. Cook Cty.*, 241 F.3d 919, 928 (7th Cir. 2001). The district court did not err.

in the work force. But American faced a unique intervening event: a major merger between two large corporations. The process of synchronizing their former policies and procedures would necessarily lead to some evolution in individual responsibilities, and an employee cannot create a dispute of fact merely by pointing to her ability to perform in the job before the merger occurred (or as the changes evolved). That's especially true when the revocation of WFHAs applied to all remote employees, not only to the disabled plaintiff.[2]

Finally, we offer a note of caution to future ADA litigants. We once said that "[a]n employer is not required to allow disabled workers to work at home, where their productivity inevitably would be greatly reduced. … [I]t would take a very extraordinary case for the employee to be able to create a triable issue of the employer's failure to allow the employee to work at home." *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995). But we also acknowledged that "[t]his will no doubt change as communications technology advances." *Id.* at 544. Technological development and the expansion of telecommuting in the twenty-four years since *Vande Zande* likely mean that such an accommodation is not quite as extraordinary as it was then. That inquiry is context-specific; a work-from-home arrangement might be reasonable for a software engineer but not for a construction worker.

"[T]here is a general consensus among courts … that regular work-site attendance is an essential function of most

---

[2] Bilinsky produced evidence that some employees were permitted to remain in Arizona after the new policy went into effect. The record shows that those employees' positions were not based out of Dallas (as was Bilinsky's) and that they were using legacy operating systems that had not yet been imported to the Dallas facility.

jobs." *Credeur v. Louisiana*, 860 F.3d 785, 793 (5th Cir. 2017) (collecting cases). The position's nature will often require face-to-face collaboration. *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (7th Cir. 2001) (en banc). But not in every instance. *See, e.g., Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603–05 (6th Cir. 2018). Here, the parties agree that telecommuting was reasonable for years before intervening events transformed Bilinsky's duties so that physical presence became an essential function of her job. Litigants (and courts) in ADA cases would do well to assess what's reasonable under the statute under current technological capabilities, not what was possible years ago.

Because it based summary judgment on the finding that Bilinsky was not a qualified individual, the district court did not reach the issue of whether American engaged in the interactive process to afford Bilinsky an alternative accommodation. We do not reach that issue, either.

## III. CONCLUSION

Bilinsky's condition prevented her from living in Texas. American accommodated that disability for several years by permitting her to work from her home in Illinois. But after a major merger, her employer determined that its remote arrangements were insufficient to meet business demands, and it uniformly rescinded those arrangements with all its employees, disabled and non-disabled alike. For the foregoing reasons, the judgment of the district court is AFFIRMED.

HAMILTON, *Circuit Judge*, dissenting. This case raises the kind of issue about flexible working arrangements under the Americans with Disabilities Act that we are likely to see more often. I agree with a good deal of the majority's opinion but respectfully dissent on the bottom line in this case. Whether working five days a week in American Airlines' Dallas head-quarters was an "essential function" of plaintiff Kimberly Bilinsky's job may well present a close question for a jury. It is not a close call on summary judgment. We should reverse the district court's grant of summary judgment and let a jury decide the issue.

First, though, the points of agreement: the majority correctly points out that the ADA's affirmative duty of reasonable accommodation requires employers to make an effort to hire and retain employees with disabilities. Courts do not and should not merely take at face value an employer's claims about a job's essential functions. Ante at 13–14. This caution is consistent with our case law, which shows, as the majority also acknowledges, how fact-sensitive these questions about essential functions and reasonable accommodations can be. See *Brown v. Smith*, 827 F.3d 609, 613–14 (7th Cir. 2016) (affirming jury verdict for plaintiff who could not obtain commercial driver's license even where written job description said such license was required for job; evidence of actual duties undermined claim of essential function); *Taylor-Navotny v. Health Alliance Medical Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014) (affirming summary judgment for employer, who was not required to tolerate "erratic or unreliable attendance"); *Miller v. Illinois Dep't of Transportation*, 643 F.3d 190, 198–99 (7th Cir. 2011) (reversing summary judgment for employer where evidence of actual work practices indicated accommodations plaintiff needed were reasonable).

Further, the majority opinion correctly and helpfully warns that our comments in *Vande Zande* about working from home as a reasonable accommodation require a fresh look today, almost a quarter of a century later, as technology and working patterns have changed. Ante at 14–15, quoting *Vande Zande v. Wisconsin Dep't of Administration*, 44 F.3d 538, 545 (7th Cir. 1995).

But returning to the specifics of this case, this record shows a genuine issue of material fact as to whether working in Dallas five days a week was actually an essential function of Kimberly Bilinsky's job. Her job had no written job description. Viewed through what should be the plaintiff-friendly lens of summary judgment, the thrust of defendant's evidence is simply that the vice president of Bilinsky's department *preferred* to have all employees work at the Dallas headquarters five days a week. I assume that arrangement would be easiest for him and other managers, but that's not the standard under the ADA.

Bilinsky has presented substantial evidence that working from home four days a week, with a weekly trip to spend the day in the Dallas office, let her perform the essential functions of her job both before and after the merger. Bilinsky continued her work-from-home arrangement for fifteen months following the merger. She received good evaluations and no criticism. The only specific evidence American managed to offer was a claim that Bilinsky's work-from-home arrangement prevented her from helping the team organize and manage one special event, a leadership conference in Dallas in

February 2015. Bilinsky counters that American never even asked her to help with the event.[1]

The unusual absence of a written job description here should raise our eyebrows about this grant of summary judgment. I agree with the majority that the absence of a job description distinguishes Bilinsky's case from *Gratzl v. Office of Chief Judges*, where a position was eliminated and we held that the plaintiff could not prove she was qualified for her current job simply because she was qualified for a previous job. 601 F.3d 674, 679–80 (7th Cir. 2010); cf. *Brown*, 827 F.3d at 613–14 (affirming jury verdict for plaintiff despite written job description identifying as essential one qualification he could not meet; evidence showed qualification was for marginal, not essential, job functions). Bilinsky had performed successfully for years. There is no new position or new job description that American can point to as evidence that the essential functions of her job changed. American's evidence of management *preferences* simply does not distinguish between job functions that are essential and those that are only marginal. Its evidence does not show the absence of a genuine issue of material fact.

While the merger may have posed new challenges for the department, the ADA requires employers to make reasonable sacrifices to keep disabled persons in the workforce. I view Bilinsky's situation as much more in line with the plaintiff in *Miller v. Illinois Department of Transportation*. Bilinsky worked on a team, and according to her immediate supervisor, Linda Carlson, Bilinsky was "always willing" to "pick up the slack

---

[1] We should not assume that Bilinsky would have refused a request or order to work in Dallas for a few days to help with that conference. Dallas in February is unlikely to be hotter than Chicago in the summer.

or to do a project." The only qualification Carlson offered was that Bilinsky's work-from-home arrangement meant she "wasn't able to do things that you needed to do to support an event," referring to the one conference that American, we must assume, did not even ask Bilinsky to help with. American did not offer conclusive evidence of essential functions that were inconsistent with Bilinsky's successful work-from-home arrangement.

As the Sixth Circuit recently explained, "full-time presence at work is not an essential function of a job simply because an employer says that it is." *Hostettler v. College of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018) (reversing summary judgment for employer; facts disputed as to whether employee could do job's essential functions on modified work schedule). As in *Hostettler*, American may have preferred that Bilinsky

> be in the office 40 hours a week. And it may have been more efficient and easier on the department if she were. But those are not the concerns of the ADA: Congress decided that the benefits of gainful employment for individuals with disabilities—dignity, financial independence, and self-sufficiency, among others—outweigh simple calculations of ease or efficiency. To that end, the ADA requires that employers reasonably accommodate employees with disabilities, including allowing modified work schedules.

*Id.* at 857.

Bilinsky's situation is much like that of the employee in *EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 881–82 (4th Cir.

2019), where the Fourth Circuit reversed summary judgment for the employer, finding among other points a genuine issue of material fact concerning whether it was an essential function of the employee's job to travel around to different job sites. Like Bilinsky, the employee in *McLeod Health* wrote and edited an internal newsletter. The employer there at least had a written job description, but it did not mention traveling to and from company events or conducting in-person interviews. *Id.* at 881. In reversing summary judgment for the employer, the Fourth Circuit explained that, while the record contained evidence supporting the employer's position, the written job description's silence on the supposedly essential function provided substantial evidence that it was not in fact an essential function. *Id.* at 881–82.

In this case, the majority sidesteps delicately around the district judge's erroneous reference to "weighing" the evidence on summary judgment, ante at 13 n.1, but the majority then makes essentially the same mistake. On summary judgment, it is not our job to decide which party's evidence is more persuasive. A jury should weigh the evidence and determine whether working from Dallas five days a week was actually an essential function of Bilinsky's job after the merger.